### AMERICAN BRAKE SHOE & FOUNDRY CO. et al. v. PITTSBURGH RYS. CO.

(District Court, W. D. Pennsylvania. May Term, 1918.)

No. 201.

Street railroads ⬿58—Receivership terminated and property restored.

  Receivership of a street railway company, which had continued for six years, terminated and the property returned to the company to facilitate a reorganization, on application of the company, concurred in by a large majority of those interested, as creditors and otherwise.

In Equity. Suit by the American Brake Shoe & Foundry Company and the St. Louis Car Company against the Pittsburgh Railways Company. On petition of defendant for discharge of receivers and return of its property. Granted.

Reed, Smith, Shaw & McClay, of Pittsburgh, Pa., for plaintiffs.
George E. Alter, of Pittsburgh, Pa., for defendant.

THOMSON, District Judge. This is a petition of the Pittsburgh Railways Company for the discharge of the receivers and the return of its property to the company. On the filing of the petition, the court directed the receivers to file an account showing the assets and liabilities of the receivership, as of December 31, 1922, together with such relevant information as might bear upon the averments of the petition, for the information of the court in the disposition of the same. The receivers fully complied with the court's order, and their account and report were referred to Hon. Henry G. Wasson, who was authorized to take testimony and make report to the court, with his opinion, concerning all the matters involved in the said petition, in order that the court might better determine the propriety of lifting the receivership and restoring the property to the Railways Company.

A large amount of testimony was taken by the master, followed by an elaborate report setting forth in very considerable detail, the unusual complications involved in the situation, together with special findings of fact, with the conclusion, in the opinion of the master, that it is for the interest of the petitioner, as well as to the public, that the receivership should be terminated as soon as possible, so that the proposed reorganization may be permitted to proceed without delay. The pending application has given the court much concern, on account of the extremely complicated situation, the large amount and value of the property involved, the manifold interests, more or less antagonistic, which are concerned, the absolute necessity for continuous operation of the railways in the manner most efficient to protect and preserve the property and meet the increasing demands of the public in the matter of transportation, having due regard at the same time to the rights and interests of the defendant and the protection of its numerous creditors, secured and unsecured.

Perhaps no system of railway transportation in the country is more involved and complicated than the Pittsburgh system, which has been

---

under operation of the receivers for six years. A most general statement of the situation will make this fact apparent. The electric street railway system provides transportation for a great industrial community Pittsburgh being the center, embracing at least 90 municipal divisions, cities, boroughs, and townships, involving multitudinous franchises and municipal grants, more than 600 miles of track, 69 miles of private rights of way, 67 bridges and viaducts, with rights in 32 more, 1,861 cars, many power-distributing stations, and more than two score car barns, shops, and miscellaneous buildings.

The system is made up of more than 200 incorporated companies, which have been brought together through leases, agreements, and stock ownership. Originally the Consolidated Traction Company, the United Traction Company, and the Southern Traction Company, separate systems, furnished the street car service for Pittsburgh and vicinity, practically all of the underlying companies belonging to one or other of these In 1901 the name of the Southern Traction Company, which had been chartered by special act of the Pennsylvania Legislature, was changed to the Pittsburgh Railways Company, and thereupon the latter company brought the respective lines into one system, through operating agreements with the Consolidated and United Traction Companies. Other companies and lines have afterwards been added The system thus composed is precarious of existence, because of the multitudinous conditions involved. This led the Public Service Commission to refer to the mutual corporate engagements and undertakings as so "easily terminable as to present at all times a very serious situation, endangering the maintenance of a stable, permanent, and unified street railway system."

Most of the underlying companies had bond issues, secured by mortgage, before entrance into the system, and their stock issues, leases, and operating agreements were, in many instances, pledged to secure the obligations of other controlling companies. Besides this, the three principal companies above named had issues of stock and bonds in millions of dollars, all of which, under the system as composed and operated, are obligations of the Pittsburgh Railways Company. The latter company is the owner of practically all the stock of the United Traction Company, and owns much of the stock of the underlying companies, most of which it has pledged as collateral for the payment of its obligations. The Philadelphia Company owns nearly all the stock of the Pittsburgh Railways Company, and also many of its bonds and notes, as well as obligations of the underlying companies and much of their stock. Under the complicated system, as it exists and is being operated, the Pittsburgh Railways Company, under agreements, holds, maintains, and operates the properties of the Consolidated and United Traction Companies, except that the cost and expense of extraordinary repairs, improvements, extensions, enlargements, and betterments shall be borne by the owner, the latter to receive the revenues therefrom. The term of the agreements is five years, terminable on three months' notice given by either party.

Prior to the appointment of the receivers, complaints from almost every source arose as to the rate of fare charged, the condition and management of the system, the condition of the cars, tracks, roadbed,

and bridges, the routing of and crowding of cars, delay in operation, and numerous other matters. Practically the problem presented was how these conditions could be remedied, so as to give reasonable relief, the character of service required by the public, and at the same time pay the interest, rentals, and obligations which the Railways Company had assumed. It seemed apparent that this could not possibly be done under existing conditions, if the same rate of fare were continued. In an endeavor to solve the problem, in January, 1918, the Public Service Commission, before whom divers complaints had been made, agreed upon the appointment of a board of valuation, consisting of five engineers, for the purpose of determining the value of the system as a basis for fixing what would be a just rate and a fair return. Many months were spent by the board, with the result that the Public Service Commission in March of 1920, finally fixed the fair valuation of the property as a going concern at $62,500,000, and dismissed all complaints as to rates.

On entering upon the work, the receivers were confronted with many and difficult problems. They were made parties to the proceedings before the Public Service Commission, and confronted with the effort to compel the making of large improvements; the employees were demanding an increase of wages; municipalities were in court, endeavoring to enforce, under their franchise grants, the payment of overdue claims; the repair of street pavements, which the company had obligated itself to maintain, the streets of many municipalities over which the lines passed being almost impassable for vehicles. This court was being asked to permit foreclosure proceedings, which would practically have meant a disruption of the system. Confronted with this situation, they increased the fare, in the first instance, from five to six cents; but this did not to any considerable extent relieve the situation. They were then forced to allow the interest on the bonds to remain unpaid, so far as possible to do so, and endeavored to raise the rate of fare, hoping that the increased revenue would enable them better to meet the situation. An effort was made to increase the fare through a zoning system of the city of Pittsburgh, which proved unsatisfactory. Later they were permitted to increase the rate to four tickets for 30 cents, or a cash fare of 10 cents. which was later increased to the present rate of three tickets for 25 cents, or a cash fare of 10 cents; this being made in September, 1920. This increase was especially made necessary by reason of the large increase of wages, which had been granted the previous year.

While the rate of fare was increased, wages of motormen and conductors were also increased. This was found to be absolutely necessary, first, from 40 to 45 cents an hour shortly after the appointment of the receivers, and a year later there was an increase of 20 per cent., and two increases in 1920, bringing the hourly wages to 70 cents, which increased the operating cost more than $2,500,000 over the preceding year; but, under the increased fare, there has been a steady and constantly increasing revenue. The character and extent of the work done by the receivers appear from the following excerpt from the master's report:

"The receivers, since they took charge and up to the end of July, 1923, have constructed new tracks in accordance with the most approved specifications as to weight and character of rails, foundations, depth of ballast, and character of· pavement, and have rehabilitated old tracks to the extent of 149.65 miles, as compared with a total of less than 125 miles of track newly laid or reconstructed in a period of over nine years preceding their appointment. Deducting the 7 or more miles of removals, there are approximately 148 miles of operating track, which should be reconstructed within the next five years. They have overhauled old cars worth keeping, installed new motors and safety devices, demanded by the heavy grades and character of topography, built new bridges and viaducts, and repaired old ones, which menaced safe travel, put in new passing sidings on suburban lines to expedite traffic, installed many automatic switches in the interest of economy of operation, built new lines for the transmission and distribution of power, added two new barns, and rearranged the storage and switching facilities in other barns and yards, to better facilitate the prompt handling of cars, installed efficient machinery and many labor-saving devices in connection with track construction and repair, purchased and put in operation, or will put in operation within the next few weeks, 125 steel cars of the most modern design, re-routing different lines in the interest of efficient service and economy of operation, have been instrumental in securing the adoption of wholesome traffic regulations, and, altogether, in line with the policy early adopted, have succeeded in bringing the railway system to a point of efficiency it had not theretofore attained."

From the master's report, it also appears that from April, 1918, to June, 1923, the receivers spent over $14,600,000 for construction and maintenance of way, and about $2,640,000 in permanent improvements, paying at the same time on principal, interest, and rentals of leased property over $15,283,000, and that the Philadelphia Company paid in the same period in interest and rentals over $1,126,000. It will thus appear that the receivers, under the most trying circumstances, kept together and operated a system surrounded with infinite complications, made important improvements, met the demands of the public for more efficient transportation, reasonably satisfied the demands of a multitude of clamorous creditors, and increased the revenue and financial status of the company to a point where it is now claimed the receivership may be justly lifted.

The report of the master also shows that for the year 1922 the railway operating revenues were $21,169,750, with expenses of $16,669,846; that the net revenue for toll bridges and inclines was $66,849; and, after deducting taxes on railway and auxiliary operations, amounting to $885,259, left a remainder as operating income, of $3,681,133. Adding to this the nonoperating income, rent of buildings, etc., the gross income derived from all the property and assets of the company in the hands of the receivers was $3,891,071, and if from this amount is deducted the payments made by the receivers for rentals, interest on funded and refunded debts, interest on mortgages of all kinds, and amounts payable for injuries and damages prior to the receivership, leaves a net income from all sources in the hands of the receivers, for that year, of $329,329.12. The elaborate account of the receivers sets forth the financial condition of the company. This is taken up and very fully considered by the master, and he draws therefrom the conclusion that, with the receivership lifted and the various agreements to extend the different liabilities enforced, there would be available a sufficient

amount of cash and other liquid assets, to meet pressing liabilities and leave a balance of more than $1,250,000, and that, if there were a liquidation of the deferred payments and verdicts, on the basis of present worth, as has been offered to all holders, and agreed to by some, there would still remain a balance of nearly $1,000,000.

No formal exceptions were filed to the master's report, but Mr. Fagan, one of the receivers, filed a report for the court's information, in which he differed with the findings and conclusions of the master. Analysis was made of this report by accountants for the Railways Company, which is shown in the nature of a reply, and which was filed of record. The whole matter was very fully argued before the court, in which special counsel for the city of Pittsburgh joined in urging that the recommendation of the master for the return of the property to the company be approved. It would be impossible, without going beyond reasonable limits, to discuss the various phases of this complicated financial situation, and I am governed in my conclusions, not because convinced of the solvency of the company, or because satisfied that the proposed method of reorganization is entirely practicable, or that the facts warrant the optimistic view taken by the petitioners and their counsel, but because the plan seems to meet with the approval of the great majority of those most directly and vitally interested. The plan of reorganization was fully set forth in an agreement entered into on December 20, 1921, between the city of Pittsburgh, the Philadelphia Company, and the Pittsburgh Railways Company, which is filed of record. The Philadelphia Company and the Railways Company also entered into agreements with 28 municipalities in which the Railways system operates, in the same form, substantially, as that made with the city of Pittsburgh. In like manner, the county of Allegheny, through its commissioners, has agreed to accept the Railways Company's offers of $350,000, to be paid without interest, in annual installments over a period of 10 years. An agreement has also been made with the borough of Braddock, in which the amount agreed upon is extended over a like period. Of the verdicts for judgments for injuries accruing prior to the receivership, aggregating something over $750,000, a large majority, namely, 72 per cent., aggregating an amount of over $500,000, have entered into agreements to accept the face of their claims without interest, extending over a period of 10 years.

In like manner, the Philadelphia Company has agreed in writing with the Railways Company, that the former will accept the face of its claim in 10 equal annual installments, without interest, provided the general creditors of the company and its receivers, holding over 80 per cent. of all liquidated claims, will extend their claim or enter into agreements similar in principle to that of the Philadelphia Company. Like agreements as to amount and extension of time of payment, have been entered into between the Railways Company and the Consolidated Traction Company, the United Traction Company, the Ft. Pitt Traction Company, the Allegheny, Bellevue & Perrysville Railways Company, the Center Avenue Street Railway Company, and the Morningside Electric Street Railway Company. The Philadelphia Company has also agreed with the Railways Company, with reference to notes and ac-

counts owing to it by the Railways Company, aggregating in excess of $3,216,600, to exonerate the receivers from any liability for the payment of the principal of said obligations, and will not demand payment of the principal, until after the expiration of four years from the date of the discharge of the receivers. By a like agreement of a later date, the Philadelphia Company agrees to save the Railways Company harmless, for a period of one year after the discharge of the receivers, from liability on notes aggregating $400,000, which are now held by the Farmers' Deposit Bank, and upon which the Philadelphia Company is the indorser. The Railways Company and the Philadelphia Company have entered into an agreement with the Union Trust Company of Pittsburgh, whereby two loans amounting to $5,000,000 will be available in the reorganization, $3,000,000 for the purchase of new cars, and $2,000,000 for the erection of car barns and other improvements. Exclusive of current obligations, the general creditors of the Railways Company, to the extent of nearly 97 per cent. in amount, have agreed to defer payment of their claims over a period of from one to ten years after the discharge of the receivers.

All of the foregoing agreements are conditioned upon, and dependent on, the termination of the receivership and the return of the property for the purposes of reorganization. It cannot be doubted that these mutual agreements by parties holding conflicting interests, whereby they mutually yield certain rights for the common welfare of the Railways system, are of the highest importance, if a reorganization is to be effected at all. To deny the petition is to abrogate all of these contracts and remand the parties to their respective rights and remedies under the law. Creditors have been patient and have thereby greatly aided the receivers in keeping the system intact, preserving the property from disintegration, and meeting with much success the demands of the public for efficient service. But, if their requests go unheeded, it can hardly be hoped that they will delay much longer in an attempt to enforce their respective claims. These aggregate nearly $8,333,-333.33⅓, out of a total of $10,500,000. The Philadelphia Company cannot be compelled to advance money to the Railways Company upon its guaranties, as it has done in the past, and certainly will not do so if there is no reasonable hope of a reorganization, and while the property remains in the hands of the receivers, no readjustment or refinancing can reasonably be expected.

The court is anxious, so far as it is possible, to protect and preserve the rights of all concerned. Creditors must be treated equally and fairly. The rights of owners, so far as possible, must be upheld and protected, and the Railways Company should be given an opportunity to perform the great public function for which it was created, if thereby the public service can be properly guaranteed. The court cannot ignore the fact that no general creditors, bondholders, or trustee under any mortgage given to secure the payment of bonds, offer objections to the application for the return of the company's property. Under all the circumstances, the court is disposed to give heed to the great majority of those, not only in number, but in interest, whose conflicting

rights are involved in this complicated and difficult situation, and therefore feels justified in granting the prayer of the petition.

A decree may be drawn, directing the return of the property and assets in the hands of the receivers to the Pittsburgh Railways Company, and thereupon the receivers to be discharged; that the court shall retain jurisdiction of the bill for the purpose of carrying out the terms and conditions of the decree, the present creditors of the company and receivers to be given priority on the property of the company so returned, subject to the lien of mortgages; that creditors be enjoined and restrained from prosecuting their claims by execution or attachment, for the period of 10 months, such creditors in the meantime, however, to have the right to proceed to liquidate their respective claims if not already in judgment, the company having the right to pay off such claims as it may be able to pay; that during the aforesaid period of 10 months the company shall agree to maintain its cash and liquid assets in the same ratio or proportion to the cash and liquid assets turned over to it by the receivers, decreased, however, proportionately, by the amount of any such claims as they may have discharged during that period. If possible, the decree should be so drawn as to avoid any further formal accounting by the receivers.